**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| **JACQUELINE DUNN, as Administrator of the Estate of CHARLES DEVAULT, deceased; SHERYL CUNNINGHAM; DEBRA LYNN BESHEAR; RENEE BROCKENSHIRE; THURMAN EUGENE DEVAULT; MARK ANTHONY STAPLETON; and MICHELLE ANN STAPLETON;**  Plaintiffs,  v.  **OFFICER RACHEL RICE; OFFICER ADAM WENDELL; OFFICER RICHARD LONG; VERMILION COUNTY; SHERIFF PATRICK HARTSHORN; and DR. BUMYONG LEE;**  Defendants. | **Case No. 04-2280** |

**OPINION**

On December 10, 2004, Plaintiffs Jacqueline Dunn, Sheryl Cunningham, Debra Lynn Beshear, Renee Brockenshire, Thurman Eugene DeVault, Mark Anthony Stapleton, and Michelle Ann Stapleton, who are suing as the special administrator or next of kin for Charles Devault, filed a Complaint (#1) against Defendants Rachel Rice, Adam Wendell, Richard Long, Patrick Hartshorn (Vermilion County Defendants), and Dr. Bumyong Lee seeking damages under a number of theories as a result of the death of Charles DeVault by suicide while in custody at the Vermilion County

Public Safety Building.[1]  This matter is now before the court on motions for summary judgment filed by the Vermilion County Defendants and Dr. Lee.  For the reasons that follow, the motion for summary judgment filed by the Vermilion County Defendants is GRANTED and the motion for summary judgment filed by Dr. Lee is GRANTED in part and DENIED in part.

FACTS

Charles Devault was born on February 4, 1976, to Plaintiff Sheryl Cunningham and Thurman Elroy Devault.  Charles began receiving psychiatric counseling in 1990.  Charles engaged in self-mutilation by cutting himself, sometimes with razor blades.  Sheryl did not believe, however, that Charles was trying to kill himself.  When Charles was sixteen years old, he was admitted to the Porter Starke Center in Valparaiso, Indiana for eight months to receive psychiatric treatment.  After that time, Charles stayed at the Shults-Lewis Home for Children, a center that housed runaway children.  By 1992, Charles was diagnosed with schizophrenia, substance abuse, and bipolar personality disorder.  Doctors opined that Charles' prognosis was poor.  In 1998, Charles attempted suicide in the Public Safety Building in Danville.  During his interview, Charles told Dr. Inayat Alikhan that he had problems at the Public Safety Building and if he continued to be in jail he would "do something dangerous."  Dr. Alikhan then wrote a letter requesting that Charles be placed in a different correctional facility because Charles said he would kill himself if he was returned to the

---

[1] Defendant City of Danville and its employees were dismissed from this action by Order (#50) entered July 15, 2005, pursuant to a stipulation of dismissal filed by the parties. Defendant Crosspoint Human Services was terminated from this action by Order (#111) entered December 13, 2006, pursuant to settlement of the parties. Furthermore, this court dismissed Plaintiffs' negligence claim pursuant to Order (#41) entered April 21, 2005. In addition, in response to the motions for summary judgment, Plaintiffs concede summary judgment is appropriate as to Defendants Wendell, Long, Hartshorn, and Lee on all federal claims against them. Plaintiffs further concede summary judgment is warranted on their loss of association claim and on their claim pursuant to the Americans with Disabilities Act.

-2-

Public Safety Building. In August 1999, Dr. Alikhan saw Charles at Provena Hospital and diagnosed him as having major depression, adult interpersonal problems, adjustment disorder, antisocial personality disorder and long-term alcohol abuse. Doctors at the Zeller Medical Center also diagnosed Charles as being a malingerer.

On November 13, 2003, Charles was with his girlfriend, Victoria Crawford, when she flagged down a police officer and asked if there were any outstanding warrants for Charles' arrest. The police officer attempted to speak with Charles, but Charles provided the officer with a false name and date of birth. After discovering Charles' identity, the officer brought Charles to the Champaign County Jail. Charles was charged with obstruction of justice. A few days later, Charles was transferred to the Vermilion County Public Safety Building. Charles was subsequently incarcerated at the Public Safety Building for violating the conditions of his work release.

Inmates at the Public Safety Building requiring psychiatric care are seen by employees of Crosspoint Human Services. The Vermilion County Sheriff's Department has a policy of providing inmates needing psychiatric care with mental health evaluations conducted by Crosspoint. Crosspoint employs "crises teams" who respond to requests from the Sheriff's Department to assess and treat the inmates. Crosspoint employees have the power to refer an inmate to a medical doctor or psychiatrist as needed and to decide an inmate needs to be placed at a state medical facility. Jail supervisors have the power to place an inmate on suicide watch if they believe the inmate is an imminent suicide risk or otherwise a danger to himself or others. In most cases, this determination is made after an evaluation by a psychiatric professional. If a jail supervisor becomes aware that an inmate is trying to harm himself, then the supervisor is supposed to act immediately and inform Crosspoint about the inmate's actions and conditions. Correctional officers at the Public Safety

Building receive training on suicide watch procedures when they go through basic training at the Illinois Police Training Institute. Inmates placed on suicide watch are to be checked at least every 15 minutes by correctional officers. In addition, inmates on suicide watch are not issued a towel or bed sheets. A padded cell is also available to inmates at the Public Safety Building. Inmates placed in the padded cell do not have access to a shower. Rather, an officer escorts the inmate to a shower and observe the inmate in the shower. Either a nurse, captain or sergeant can decide whether an inmate is placed in a padded cell.

On November 27, 2003, Charles cut his wrists. Charles was taken by jail officials to the hospital, treated by medical personnel, and returned to the Public Safety Building. At that time, Charles was placed on suicide watch. Charles was seen later that day by a licensed professional counselor/crisis supervisor from Crosspoint, Bryan Manion. Manion met with Charles for over forty-five minutes. Charles told Manion that one of his "personalities" told him to harm himself. Charles further refused to sign a "no-harm contract" in which Charles would agree not to harm himself. Manion diagnosed Charles as suffering from paranoid shizophrenia, borderline personality disorder, and depression. Manion believed Charles could be a danger to himself or others. Manion spoke with the on-call psychiatrist, Dr. Thomas Hermann, about Charles' condition. Dr. Hermann did not believe that Charles needed to be placed at a psychiatric hospital or in a padded cell at the jail. A jail official informed Manion that Charles was going to be placed in a room with a camera, and Manion agreed this was a safe environment for Charles. Crawford informed jail officials that Charles slit his wrists as a way of getting out of jail.

Subsequently, Charles was placed in the fourth floor dormitory of the jail. These arrangements were made by Lieutenant Ray Lewellyn because Charles could be monitored inside

the room via cameras and the dormitory was easily accessible from the fourth floor control room. The dormitory had two cameras mounted on opposite ends of the room. These cameras allowed officers to see the entire dormitory, except for the shower room. Charles was provided with a towel, bed sheet, blanket, and mattress while in the dormitory. Charles was not provided with razors and was served his meals with plastic utensils and paper cups. This was done because Charles had a history of swallowing sharp objects. When initially placed in the dormitory, Charles was placed on suicide watch, meaning he was subject to dormitory checks by correctional officers every fifteen minutes. On November 30, 2003, Lieutenant Lewellyn and Captain Les Riggs determined that Charles no longer needed to be checked every fifteen minutes because he had made no other attempts to harm himself. Lewellyn did not talk to anyone at Crosspoint about Charles before making this decision. As a result, Charles' dormitory was checked every thirty minutes.

On December 3, 2003, Manion spoke with Captain Riggs and scheduled a psychiatric evaluation for Charles at the jail on December 8, 2003. On that date, Amy Gilbert, a Crosspoint crisis intervention counselor, met with Charles. Gilbert completed a bio-psycho-social assessment of Charles. Following her evaluation, Gilbert did not believe Charles was likely to harm himself in the immediate future or that Charles needed to be referred to an outside treatment center. Following the meeting, Charles signed a "no-harm contract," in which Charles promised not to do anything to harm himself. After the meeting, Gilbert scheduled a psychiatric evaluation for Charles by Dr. Bumyong Lee for December 18, 2003.[2] Dr. Lee testified that he was aware Charles was "carrying a potential risk of harming himself at any given time" but when he saw him he "didn't see that there's any danger to hurting himself at that time." Dr. Lee further testified that he assumed Charles

---

[2] Dr. Lee contracts with Crosspoint Human Services.

was in a padded cell and expected he would be kept in a padded cell. However, he did not tell anyone he should be kept in a padded cell because did not believe Charles was a danger to himself. Dr. Lee prescribed an anti-anxiety drug, Zyprexa, for Charles. Charles was to be given this medication every night between December 18 and 21, 2003. Neither Dr. Lee nor Crosspoint employees instructed jail employees to put Charles on suicide watch, place him in a padded cell, or admit him to a psychiatric hospital. Dr. Lee further testified that checking on Charles every thirty minutes would meet his level of expectation as to the type of monitoring Charles should be receiving.

Jail nurse Bonita Koppman also spoke to Charles nearly every day during December 2003. Koppman testified she did not believe Charles to be suicidal. Koppman indicated Charles had told her he knew that cutting his arms previously was wrong and he was not going to do it anymore. On December 20, 2003, Charles cut his arm again and Koppman was called at home by jail officials. Koppman examined Charles and determined that his cuts were superficial and did not need stitches. Charles informed Koppman he wanted to continue taking the medication Dr. Lee prescribed. Charles further indicated he would be going to court on January 15, 2004, and he would be fine until then. Charles did not indicate he was suicidal or wanted to further hurt himself.

On December 22, 2003, there were nine correctional officers on duty during the day shift. Rachel Rice, Adam Wendell, and Richard Long were three of those officers. Rice, Wendell, and Long were working on the fourth floor of the jail that day. Rice was working in the fourth floor control room. The control room is located approximately twenty feet from the dormitory where Charles was residing. Officers working in the control room are required to observe twelve black and white monitors which reveal the various areas inside the jail. Each cell block has one monitor. Rice

testified that throughout December she would speak with Charles often to let him know officers were paying attention. Rice indicated she believed Charles was acting normally on December 22, 2003. On that morning, at around 10:00 a.m., Wendell went into the dormitory area to turn on the television. Wendell asked Charles if the volume level was acceptable. Charles told Wendell to turn the volume down but otherwise voiced no complaints. Wendell testified Charles told him he was fine and that his girlfriend was expecting a child. Charles was served lunch at 11:00 a.m. Wendell picked up Charles' tray at around 12:00 p.m. and observed Charles had eaten. Long also spoke to Charles around lunchtime without incident.

At approximately 12:20 p.m., Charles asked Rice for a request form. Rice indicated she would bring him one at lock up-time, approximately 2:30 p.m. Charles indicated that would be fine. Charles never indicated he was going to harm himself or asked to see a nurse, doctor, or counselor. Wendell made his cell check of the dormitory at 12:32 p.m., 1:01 p.m., 1:30 p.m., and 2:00 p.m. At approximately 2:00 p.m., Charles got out of bed and took what appeared to be a towel to the shower area. Rice yelled down the hallway to Charles to ask if he was alright. Charles indicated he was fine and was going to take a shower. Rice observed Charles on the monitor enter the shower area and drape what appeared to be a towel over the wall between the showers. Because the camera monitors did not show the shower area, Rice could not observe anything else. After approximately ten minutes had passed, Rice radioed Wendell to check on Charles. Wendell was on the first floor of the building at the time he received the call, but walked upstairs and entered the dormitory area approximately three to five minutes later.

Wendell entered the shower area after not receiving a response to his call to Charles. Wendell observed Charles' right arm hanging out of the shower area. Wendell observed that

Charles had tied a bed sheet around his neck, although Charles' feet were still on the ground. Wendell picked up Charles and called for backup advising of an emergency on the fourth floor. Long came within one to two minutes of hearing the radio call and cut down the bed sheet using a pocket knife. After the sheet was cut down, Rice and Koppman began performing CPR on Charles. Charles was taken to the hospital by ambulance. Charles died at the hospital on December 25, 2003.

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the court must decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In reaching this decision, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The burden of establishing that no genuine issue of material fact exists rests with the movant. Jakubiec v. Cities Serv. Co., 844 F.2d 470, 473 (7th Cir. 1988).

### A. Federal Claims

Plaintiffs first assert that Officer Rice[3] was deliberately indifferent to a known risk of Charles' suicide contrary to his rights under the Eighth Amendment.[4] To sustain a § 1983 claim

---

[3] Plaintiffs originally asserted this claim against Defendants Wendell, Long, and Hartshorn as well. However, in their response to the motions for summary judgment, Plaintiffs concede these defendants are entitled to summary judgment on the federal claims against them.

[4] While the Eighth Amendment does not apply to Charles as a pretrial detainee, Charles' may assert a claim pursuant to the Fourteenth Amendment because pretrial detainees are entitled

based upon a violation of the Eighth Amendment, a subjective and an objective element must be met: "(1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006). In cases where a prisoner has committed suicide, the first prong is necessarily met. Collins, 462 F.3d at 760. With regard to the second subjective element, Plaintiffs must demonstrate the defendant officers: "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." Collins, 462 F.3d at 761. With regard to this subjective element, "'it is not enough that there was a danger of which a prison official should have been aware.'" Collins, 462 F.3d at 761, quoting Estate of Novack v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000). Rather, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Collins, 462 F.3d at 761, quoting Estate of Novack, 226 F.3d at 529. The officers will not be found liable where "'the defendants simply were not alerted to the likelihood that the [prisoner] was a genuine suicide risk.'" Collins, 462 F.3d at 761, quoting Boncher v. Brown County, 272 F.3d 484, 488 (7th Cir. 2001).

Deliberate indifference requires a showing of "'more than mere or gross negligence, but less than the purposeful or knowing infliction of harm.'" Collins, 462 F.3d at 762, quoting Matos v. O'Sullivan, 335 F.3d 553, 557 (7th Cir. 2003). More specifically, the Eighth Amendment requires "'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'"

---

to at least the same protection against deliberate indifference to their basic needs as is available to convicted prisoners under the Eighth Amendment. Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003).

Collins, 462 F.3d at 762, quoting Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). While this is a "high hurdle", Plaintiffs "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Cavalieri, 321 F.3d at 621-22 (citations omitted).

In support of their claim, Plaintiffs allege that Defendant Rice was deliberately indifferent because she was aware of previous suicide attempts and because she failed to properly monitor Charles when he entered the shower area of the dormitory. Plaintiffs point to Charles' statements in 1998 that he would "do something dangerous" if he was ever returned to the Public Safety Building and the subsequent letter from his then-doctor indicating Charles could commit suicide if he was returned there. Plaintiff s further argue that Rice was deliberately indifferent because she was aware of Charles' suicide attempt on November 27, 2003, and failed to adequately monitor Charles when she saw him enter the shower on the monitor. Plaintiffs argue Rice should have been aware Charles was committing suicide in the shower because she did not hear water running and did not observe him carry toiletries into the shower. Furthermore, Plaintiffs argue that Rice did not call for help for Charles in a timely manner.

The facts of this case resemble those of Collins in which the Seventh Circuit determined correctional officers were not deliberately indifferent to a known risk of a prisoner's suicide. In Collins, the prisoner indicated to a correctional officer that he was "feeling suicidal" and wanted to speak to a crisis counselor. Collins, 462 F.3d at 759. The request was passed up the chain of command, although the fact that the prisoner was suicidal did not reach the crisis counselor. Collins, 462 F.3d at 759. Fifteen minutes later, the same correctional officer returned to the prisoner and informed him that the counselor would be there as soon as she finished escorting prisoners. Collins,

462 F.3d at 759. The prisoner responded that he could wait until the counselor arrived. The correctional officer looked in on the prisoner at least once in the following twenty minutes. Collins, 462 F.3d at 760. A different correctional officer checked on the prisoner at thirty-five minutes after his initial request and observed the prisoner sitting in his cell. Collins, 462 F.3d at 760. The prisoner was found twenty minutes later having hung himself with a bed sheet. Collins, 462 F.3d at 760. The Seventh Circuit found that the evidence did not support a finding of deliberate indifference on the part of any of the officers, including the officer who was initially informed by the prisoner that he was feeling suicidal. Collins, 462 F.3d at 761-62.

Likewise, this court finds that the undisputed facts in this case do not reach the level of deliberate indifference. Charles had met with Gilbert and Dr. Lee in the weeks prior his suicide, and neither mental health professional believed Charles presented an imminent risk of suicide. Charles signed a "no-harm contract" with Gilbert on December 8 indicating he would not attempt suicide. Charles was also receiving psychiatric medication prescribed by Dr. Lee. Also in December 2003, Charles informed the jail nurse that he was aware it was wrong for him to cut his arms in November 2003 and he would not be doing it again. Charles further informed the jail nurse that he would be fine until his next scheduled court hearing in January 2004. When Charles spoke with Officer Wendell on the morning of December 22, 2003, he gave no indication he was feeling suicidal. Rather, he spoke with the officer about the pregnancy of his girlfriend. At approximately 12:20 p.m., Charles asked Rice for a request form, and Rice indicated she would bring it at lock-up time, or 2:20 p.m., and Charles indicated that would be fine. Charles did not indicate he desired to harm himself nor did he ask to speak to a health care professional. When Rice observed Charles enter the shower area carrying what appeared to be a towel, she asked Charles if he was alright. Charles

-11-

indicated he was fine and would be taking a shower. When Charles did not emerge from the shower in ten minutes, Rice called for someone to check on Charles. Rice heard Wendell yell Charles' name and entered the dormitory to perform CPR on Charles. Based upon these facts, this court concludes Plaintiffs have failed to raise a genuine issue of material fact as to whether Rice was deliberately indifferent to the risk of Charles' suicide.[5]

Plaintiffs also allege a claim against Vermilion County pursuant to Monell v. New York City, 436 U.S. 658 (1978). Plaintiffs allege Vermilion County had a policy of failing to protect emotionally distressed prisoners in that it was deliberately indifferent in the hiring, training, and supervision of employees with regard to the treatment of suicidal inmates. However, because Plaintiffs have failed to demonstrate that any individual officer was deliberately indifferent to the needs of Charles, there is no basis for liability under Monell. See Thompson v. Boggs, 33 F.3d 847, 859 (7th Cir. 1994). See also Tesch v. County of Green Lake, 157 F.3d 465, 477 (7th Cir. 1998) ("[a] failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim"). [6]

### B. State Law Claims Against Vermilion County Defendants

Plaintiffs also allege state law claims against the Vermilion County Defendants for wrongful

---

[5] Because this court determines that the undisputed facts do not support a finding of deliberate indifference, this court needs not reach the issue of whether Officer Rice is also entitled to qualified immunity.

[6] Plaintiffs also bring a separate due process claim alleging Defendants' deliberate indifference shocks the conscience. Plaintiffs have not asserted how this is a separate claim, nor are Plaintiffs required to meet a "shock the conscience" standard to establish deliberate indifference. See Catchings v. City of Chicago, 2006 WL 1371440 at *4 (N. D. Ill. 2006). However, because Plaintiffs are unable to establish deliberate indifference under a lesser standard, any separate claim must necessarily fail.

death, conscious pain and suffering, and willful and wanton conduct.[7]  The Illinois Local Government and Local Governmental Employee's Tort Immunity Act entitles local public entities and public employees to immunity from tort liability unless their conduct is deemed willful and wanton. 745 Ill. Comp. Stat. 10/4-105; Thomas v. Cook County Sheriff, 401 F. Supp. 2d 867, 876 (N. D. Ill. 2005). Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm, or if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210. A finding of willful and wanton conduct does not result from mere inadvertence, incompetence, or unskillfulness. See Moran v. City of Chicago, 676 N.E.2d 1316, 1323 (Ill. App. Ct. 1997). This standard is "remarkably similar" to the deliberate indifference standard under federal law. See Payne v. Churchich, 161 F.3d 1030, 1041 n. 13 (7th Cir. 1998).

Plaintiffs argue that the facts support a finding of willful and wanton conduct based upon three circumstances involving Lieutenant Lewellyn. Plaintiffs first assert that Lewellyn's decision not to place Charles in a padded cell upon his return to the Public Safety Building on November 27, 2003, was willful and wanton conduct. Second, Plaintiffs assert a finding of willful and wanton conduct is justified based upon Lewellyn's decision to remove Charles from suicide watch on November 30, 2003, without consulting a medical care provider. Finally, Plaintiffs assert the facts support an inference that Lewellyn lied to Manion on November 23, 2003, when he told Manion that he contacted the state's attorney regarding whether the state's attorney was willing to drop the

---

[7] As set forth below, Plaintiffs are unable to establish willful and wanton misconduct on the part of the Vermilion County Defendants. Furthermore, Illinois law does not support a claim against these defendants for willful and wanton misconduct as an independent tort. See Muniz v. Rexnord Corp., 2006 WL 1430553 at *1 (N. D. Ill. 2006).

charges against Charles to allow Charles to be admitted to a psychiatric hospital. Plaintiffs assert that because it was customary for Lewellyn to tell a medical provider to contact the state's attorney for approval for hospitalization, it can be inferred that Lewellyn lied.

This court finds that the undisputed facts are insufficient to survive summary judgment on this issue. Charles did not hang himself until 22 days after the incident when he cut his wrists. Between these two time periods, Charles was seen by Amy Gilbert and Dr. Lee. Both of these individuals testified that they did not believe Charles was suicidal or that he required more protection than that which he was receiving. No mental health professional that saw Charles recommended that Charles be kept in a padded cell, be placed on suicide watch, or be sent to a psychiatric hospital. Furthermore, Charles was placed in a dormitory room where he could be monitored more closely by camera. Charles was not permitted to have a razor, steel eating utensils, or other sharp objects. Charles was also prescribed and given anti-psychotic medication. The fact that Charles was not placed on suicide watch which would require him to be checked every 15 minutes rather than every 30 minutes can at most be considered negligence, particularly in light of Charles being placed in the dormitory where his activity was monitored by cameras. Furthermore, it can hardly be argued that Charles should have been placed in a padded cell for weeks at a time and the failure to do so is a "conscious disregard for safety." Plaintiffs have presented no evidence that being confined in these conditions at the Public Safety Building would ever be appropriate. Finally, Plaintiffs' unsupported assertion that Lewellyn lied regarding speaking to the state's attorney is irrelevant as no one who saw Charles after the November incident recommended that he be placed in a mental hospital. Accordingly, this court concludes summary judgment is warranted as to

Plaintiffs' state law claims against the Vermilion County Defendants.[8]

## C. State Law Claims Against Dr. Lee

Plaintiffs have also brought state law claims against Dr. Lee for medical negligence, wrongful death, conscious pain and suffering, and willful and wanton misconduct. 28 U.S.C. § 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. The Seventh Circuit has stated that "the general rule is that when all federal clams are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." Kennedy v. Schoenberg, Fisher, & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998), cert. denied, 525 U.S. 870 (1998), quoting Wright v. Associated Ins. Co. Inc., 29 F.3d 1244, 1251 (7th Cir. 1994). "At that point, respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." Kennedy, 140 F.3d at 728. There is nothing in the record which indicates that the considerations of judicial economy, convenience, fairness or comity require this court to hear the state claims against Dr. Lee. While the interest of judicial economy favored this court resolving the state law claims against the Vermilion County Defendants because of the substantially similar standard between the federal deliberate indifference standard and the state willful and wanton standard, there is no such similarity to the medical negligence claim against Dr. Lee. Therefore, this

---

[8] Plaintiffs allege no additional facts against the remaining named Vermilion County Defendants in support of their wrongful death or conscious pain and suffering claims than were alleged in support of their § 1983 claim. Thus, for the reasons stated above with regard to the § 1983 claim, this court concludes summary judgment is warranted as to all Vermilion County Defendants on the wrongful death and conscious pain and suffering claims. See Payne, 161 F.3d at 1041 n. 13 (willful and wanton standard under state law "remarkably similar" to deliberate indifference standard under federal law).

court declines to exercise supplemental jurisdiction over the state law claims against Dr. Lee. Pursuant to 28 U.S.C. § 1367(d), Plaintiffs may refile the state law claims against Dr. Lee in the state court within 30 days of entry of this order.

IT IS THEREFORE ORDERED:

(1) Vermilion County Defendants' Motion for Summary Judgment (#100) is GRANTED.

(2) Dr. Lee's Motion for Summary Judgment (#98) is GRANTED in part and DENIED in part.

(3) This court declines to exercise supplemental jurisdiction over the state law claims against Dr. Lee. Plaintiffs may refile their state law claims against Dr. Lee in the Vermilion County Circuit Court within thirty (30) days of entry of this order.

(4) The final pretrial conference scheduled in this matter for February 9, 2007, and the jury trial scheduled to begin February 26, 2007, are VACATED.

(5) This case is terminated.

ENTERED this 22nd day of January, 2007

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE